2025 IL App (1st) 241554-U

FIRST DISTRICT,
SIXTH DIVISION
June 27, 2025

No. 1-24-1554

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| KIMBERLY BULOW,<br><br>                        Petitioner,<br><br>v<br><br>BOARD OF EDUCATION OF THE CITY OF CHICAGO, DISTRICT 299, PEDRO MARTINEZ, in his official capacity as Chief Executive Officer of the Chicago Public Schools, and the ILLINOIS STATE BOARD OF EDUCATION,<br><br>                        Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Petition for Direct Administrative Review of an Order of the Board of Education of the City of Chicago.<br><br><br>Board Resolution No. 24-0627-RS5 |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The decision of the Board of Education of the City of Chicago (Board) to terminate a tenured teacher for cause and without written warning is clearly erroneous where the Board's findings of fact are against the manifest weight of the evidence.

¶ 2     Petitioner Kimberly Bulow appeals from a final administrative decision of the Board of Education of the City of Chicago (Board), terminating her employment as a tenured teacher for Chicago Public Schools (CPS) for restraining a student involved in a violent fight during an

after-school basketball game. We reverse the Board's decision, as the factual findings of the Board are against the manifest weight of the evidence. Therefore, the decision to terminate Bulow for cause and without written warning is clearly erroneous.

¶ 3                                    I. BACKGROUND

¶ 4        Bulow was as a teacher for CPS from 2012 to 2022. She was described as a phenomenal teacher whom her students loved and trusted. She had never been disciplined until the incident giving rise to this case, which resulted in her termination without warning.

¶ 5        From 2014-2020, Bulow worked as a tenured special education and English teacher at Infinity Math, Science & Technology High School (Infinity). She also coached girls' soccer, track, and basketball. Infinity shares a campus with four other CPS schools, including World Language High School (World Language). Each school has its own academic suite, but they share other spaces like the gym.

¶ 6        On January 30, 2020, Bulow was coaching a girls' basketball game after school when a fight broke out seconds before the end of the game. Bulow grabbed one of the fighters, 17-year-old World Language student J.B. She brought J.B. to the floor and restrained him until the fight subsided. On February 12, 2020, Bulow was suspended from her position without pay.

¶ 7                                  A. Dismissal Charges

¶ 8        On June 10, 2021, the Chief Executive Officer (CEO) of CPS approved dismissal charges against Bulow. Bulow was charged with negligence, corporal punishment, physical abuse, discourteous treatment, and various violations of Board, CPS, and Illinois State Board of Education policies, including CPS policy 08-0723-PO4: "Use of Momentary Physical Internventions with Students." The CEO alleged Bulow "caused J.B. to have difficulty breathing and caused him pain" by wrapping her arms around his "neck and shoulder while he struggled to

escape"; "hook[ing]" her legs around his and causing him to fall; holding her arms around his neck and shoulder for approximately two minutes while he struggled to stand up; continuing to hold him while he stood up; bringing him to the ground again; and continuing to hold him there even though he asked to be released. Bulow requested a hearing on the charges per section 34-85 of the Illinois School Code (School Code) (105 ILCS 5/34-85) (West 2020)).

¶ 9                                   B. Hearing

¶ 10                                  1. The Incident

¶ 11        Hearing officer Jacalyn Zimmerman heard testimony via videoconference on January 24, June 14, and June 17, 2022. J.B. testified that on January 30, 2020, he was watching the girls' basketball game after school. When he went out into the hallway, a fight broke out between himself, his friends, and three guys he had fought with about two weeks prior. J.B. hit three of the guys, one of them hit him on the forehead, and another guy tore J.B.'s shirt, so he ripped his shirt off completely.

¶ 12        J.B. testified that when the fight spilled into the gym, "out of nowhere, *** Bulow jumped on [his] back." However, upon reviewing the security footage, J.B. admitted he was first grabbed from behind and dragged around by the Athletic Director Michael Zagorski, not Bulow. He struggled and broke free from Zagorski twice before Bulow approached. According to J.B., Bulow did not say anything before she grabbed him with her forearm "around [his] neck, and *** lock[ed] it in with her other arm." J.B. was trying to shake her off, but Bulow was "choking" him. She wrapped her leg around his and was "squeezing [his] neck." J.B. said he "couldn't breathe very good at all" and "was getting ready to black out."

¶ 13        J.B. told Bulow to get off him and was groaning and making "angry sounds." Bulow held him on the ground for three or four minutes. Bulow was sitting on her side with her legs out

behind her with her left arm hanging down in front of her while J.B. was lying down in front of her, also on his side. He eventually stood up, but Bulow held onto him and "kept choking [him]," so he fell back down. Bulow held him on the ground for another two minutes.

¶ 14    J.B. admitted that when he initially entered the gym, he wanted to keep fighting, but Bulow prevented him from doing so. When she let him go, J.B. claimed he went back into the hallway, grabbed his backpack, and went home. However, when confronted with the security footage, J.B. admitted he exited out of doors that led outside rather than to the hallway where his backpack was located. He returned to the gym and started yelling at "G," intending to fight him again until he was intercepted by another student.

¶ 15    J.B. testified he went immediately to Mount Sinai Hospital for neck and shoulder pain, but hospital records show he waited three days to go. He was prescribed ibuprofen. His neck and shoulder were stiff and sore for about a month and a half, but mainly his ego was bruised. Students took videos of the incident and sent them to him. He was "humiliated" because it "could have went very viral" and he "could have harmed [himself] over that." However, J.B. admitted he was never "teased" by other students; he just heard them talking about it. He said he was "humiliated" not because a woman held him to the ground, but because she held him for "too long" and it was recorded. After the incident, J.B. transferred to another school for six months before dropping out of high school altogether. Without acknowledging his own instigating behavior, J.B. believed Bulow should lose her job for what she did.

¶ 16    J.B.'s grandfather Alphonso B. testified that J.B. said he was hit about his face and body during the fight and that he "continued to defend himself" after Bulow released him. Alphonso took J.B. to the hospital because his neck and back were bruised and swollen. J.B. was in pain

for a couple of weeks. J.B. was too afraid and humiliated to go back to school. He went back a couple of times before Alphonso transferred him to another school.

¶ 17    Bulow testified that when the fight spilled into the gym, she started yelling for the fighters to stop. She saw "a guy [J.B.] rip his shirt off" and "mov[e] very quickly to attack people." J.B. was not one of Bulow's students and she had never seen him before. Bulow described the situation as extremely dangerous. No security was present, and people were "all over the place fighting and punching each other in the head." This prompted her to move quickly to restrain J.B. because he was closest to her players, he had ripped his shirt off, appeared to be the main instigator, and was very violent. Bulow told her team to go back to the bench because there was fighting in front of the locker room, but they ended up standing around her and J.B.

¶ 18    Bulow used techniques she learned as an amateur mixed martial arts fighter trained in jiu-jitsu and wrestling to restrain J.B. She used a "seatbelt grip," putting "one arm over his shoulder and then another arm underneath his armpit." Bulow described this as a safe and effective way to hold onto somebody since "you're not doing anything that is going to restrict their breathing" or hurt their joints. Bulow then tried to "pick" at J.B.'s legs to bring him to the ground. Once on the ground, she used a "side control" method, where she was "sitting beside him" with "one arm over his shoulder and then the other arm under his armpit." She considered this method to be safe since "[y]ou're not on top of" the person and can easily move around with them as they move.

¶ 19    Bulow said it did not seem like J.B. was having any difficulty breathing because he was "fighting [her] the entire time," trying to get free, yelling, banging his fists against the floor, and saying "I'm going to f*** kill them. Let me go because I want to f*** kill them." She told J.B. she would let him go if he calmed down. Indeed, once the fight subsided, she released J.B. He jumped up and headed towards the door.

¶ 20    Zagorski and the Dean of Students Frankie Melendez were also in the gym and tried to break up the fighters. Michelle Olbera was the only security officer on duty that evening, but she was stationed at the school's main entrance, which was a five-minute walk from the gym. There was no intercom in the gym to call security, and Melendez was the only one there with a radio. Olbera testified that Melendez eventually radioed her to show the police to the gym when they arrived, but she was not called to help with the fight before then.

¶ 21    Security footage from two different camera angles were admitted into evidence. The footage shows that when the fight breaks through the gym doors, Zagorski runs toward the doors while Bulow remains on the bench with her team. Zagorski grabs J.B. from behind while J.B. struggles against him. J.B. eventually breaks free, but Zagorski grabs him again. Meanwhile, Bulow watches from the bench for approximately 33 seconds. She gets up, walks to the other end of the bench, observing for another 12 seconds before running toward the fight. At this point, J.B. breaks free from Zagorski again and more people rush further into the gym.

¶ 22    Bulow runs toward the fight, waving her arms and pointing at the fighters for about eight seconds. She then grabs J.B. from behind, but it is difficult to tell where her arms are positioned. J.B. struggles against Bulow for 20 seconds while she picks at his legs with hers, eventually bringing him to the floor. Bulow's team gathers around, largely blocking the view of J.B. and Bulow. However, about 30 seconds later, Bulow can be seen on her hip with the legs out in front of her while J.B.'s legs are out to the opposite side. This is consistent with the "side control" method Bulow described.

¶ 23    J.B. starts to struggle against Bulow, and Bulow moves around with J.B. on the floor. They are on the floor for about two minutes before J.B. stands up. Bulow brings him back down,

where they stay for another two minutes, once again, surrounded by Bulow's team. Bulow never appears to be on top of J.B., rather, she is always laying on her side next to him, as she testified.

¶ 24 While Bulow restrains J.B., the other fighters continue to run around the gym, punching and attacking each other. When Bulow releases J.B., he immediately gets up and walks away while shaking his fists. He initially walks out of view of the camera but can be seen a bit later saying something to one of the guys he was fighting. J.B. admitted he was yelling at "G" and intended to fight him again until he was stopped by someone else.

¶ 25                                    2. CPS Policy and Training

¶ 26 The evidence shows that CPS teachers are not trained in how to break up or otherwise handle physical fights between students. According to Bulow, she had never seen nor was trained in the CPS policy entitled "Use of Momentary Physical Interventions with Students." Infinity special education teacher Ronald Hamilton testified that during the 13 years he worked for CPS, he never received training on how to break up fights between students. He nevertheless broke up several fights and would even use a wrestling hold to restrain students. He was never disciplined for doing so. Infinity Principal Charles Smith testified that he tells his staff to give "verbal directions" and contact security if a fight breaks out, as security is the only staff trained in professional de-escalation.

¶ 27 Jadine Chou, CPS's Chief of Safety and Security, testified as an expert in CPS safety and security policies, specifically with respect to CPS policy on the use of momentary physical interventions with students. The policy in effect in January 2020 has since been rescinded, and a new more restrictive policy adopted. The policy in effect in January 2020 defines "momentary physical intervention" as the "temporary physical restriction of a student using limited force by direct person-to-person contact or the temporary restriction of a student's movements, without

the aid of material or mechanical devices." Momentary physical intervention is allowed "in emergency situations to prevent a student from completing an act that would result in potential physical harm to himself or another or damage to property" or "to remove a disruptive student who is unwilling to voluntarily leave an area."

¶ 28 According to Chou, the policy was available in CPS's employee information and on a public website. CPS effectuates the policy by providing annual safety-care training to all security guards and some diverse learners, but teachers do not receive safety-care training. Safety-care training teaches progressive de-escalation protocols, starting with verbal commands and progressing through physical interventions, from a shoulder check to a supportive guide, then from a one-person to a two-person "stability hold." Physical intervention is supposed to be a "last resort, as the situation comes up" and should be as "brief as possible, *** ideally moments, *** seconds, maybe a brief few minutes." It "is not about restraining them until submission. It is about restraining them until absolutely necessary." The goal is to restrain for as short of time as possible, although there is "no specific time count" and "temporary" is not defined by the policy.

¶ 29 Chou testified that Bulow did not use an "appropriate, allowable safety-care hold," and violated CPS policy because she used a hold that was "not approved" and "dangerous." In Chou's estimation, the hold was "longer than conventionally what we think about as a momentary physical intervention," and Bulow should have escorted her team to the locker room and enlisted the help of someone with safety-care training. Albeit no such person was present.

¶ 30 C. Hearing Officer's Findings of Fact and Recommendations

¶ 31 On April 16, 2024, Zimmerman issued findings of facts and recommended Bulow be reinstated to her position. Zimmerman largely credited Bulow's account over J.B.'s, finding her

testimony to be clear and consistent. J.B., on the other hand, was unreliable given his "critical inconsistencies" and admitted bias in wanting Bulow to be fired.

¶ 32     Zimmerman discredited J.B.'s testimony that Bulow was choking him since he was able to struggle and yell and managed to stand up. And while J.B. may have experienced "discomfort," it was minimal and "may well have resulted from the fight itself or his struggles to get away." As to J.B.'s humiliation, this stemmed from his own actions in engaging in the fight, which resulted in the incident being recorded. Finally, Zimmerman found Bulow did not violate CPS policy, which allowed her to intervene "in the case of an emergency, which this certainly was," and where she was never trained on the policy.

¶ 33     Zimmerman concluded the CEO lacked cause to terminate Bulow where it failed to prove by a preponderance of the evidence that her conduct was *per se* irremediable; it was not cruel, negligent, incompetent, corporal punishment, and did not cause J.B. physical or psychological harm. Nor did it constitute irremediable conduct under *Gilliand* (*Gilliland v. Board of Education of Pleasant View Consolidated School District*, 67 Ill. 2d 143 (1977)), where it could have been corrected with a warning from her superiors. Zimmerman recommended the Board reinstate Bulow and "make her whole for her losses."

¶ 34                              D. Board's Opinion and Order

¶ 35     On June 27, 2024, the Board issued its final administrative decision. The Board accepted some of Zimmerman's findings of facts and rejected others and ultimately dismissed Bulow for cause. The Board agreed that J.B. was one of the primary wrongdoers, that no one called the one security guard on duty for assistance, and that Bulow did not receive training from CPS on how to break up a fight. However, the Board disagreed with Zimmerman that Bulow did not restrict J.B.'s breathing. The Board credited J.B.'s testimony over Bulow's since "J.B. is the only

participant who could testify competently about his breathing" and because his testimony was corroborated by two statements in the investigative report indicating J.B. was placed in a "headlock" and was "breathing hard."

¶ 36    The Board further found J.B. sustained physical pain and humiliation based on his own testimony, hospital records, his ibuprofen prescription, and his grandfather's description of his bruised and swollen back and neck. The Board found J.B.'s pain and humiliation were caused by Bulow and rejected Zimmerman's assessment that J.B.'s humiliation resulted from his own actions. Finally, relying on Chou's testimony, the Board found Bulow violated CPS policy because her hold was not temporary and she did not use limited force. All this led the Board to find sufficient cause to terminate Bulow without written warning because her conduct was irremediable *per se*. Specifically, the Board deemed her behavior negligent, cruel, and caused physical and psychological harm to J.B. Bulow appeals. See 105 ILCS 5/34-85(a)(8) (West 2024) (allowing a teacher to seek direct judicial review of the Board's decision in this court).

¶ 37                                          II. ANALYSIS

¶ 38    Bulow challenges the Board's factual findings as against the manifest weight of the evidence. She also asserts the Board did not have cause to terminate her without written warning because her conduct was not irremediable *per se*. Using the standard of review set forth in *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, we agree.

¶ 39    In considering Bulow's appeal, we must review the Board's factual findings, as well as the factual findings of the hearing officer that were incorporated into the Board's decision, to determine first whether those findings are against the manifest weight of the evidence. *Id.* at ¶ 63. Second, we determine if the findings of fact provide a sufficient basis for the Board's

conclusion that cause for discharge exists. *Id.* The Board's "determination of cause to discharge is not *prima facie* true and correct; it is instead subject to reversal where it is arbitrary, unreasonable, or unrelated to the requirements of service. [Citation.] We apply the clearly erroneous standard of review to this mixed question of fact and law, *i.e.*, whether we are 'left with the definite and firm conviction that a mistake has been committed' when applying the established facts to the applicable legal standard for discharge. (Internal quotation marks omitted.) [Citation.]" *Id.*

¶ 40     A. The Board's Factual Findings Are Against the Manifest Weight of the Evidence

¶ 41     Bulow challenges three critical factual findings made by the Board as against the manifest weight of the evidence: (1) Bulow restricted J.B.'s breathing, (2) Bulow caused J.B. physical and psychological pain, and (3) Bulow violated CPS policy. We take each in turn.

¶ 42                         1. Bulow Did Not Restrict J.B.'s Breathing

¶ 43     The Board's finding that J.B.'s breathing was restricted was based on its crediting of J.B.'s testimony over Bulow's because his testimony was "clear and consistent" and, ostensibly, only J.B. could competently testify as to whether his breathing was restricted. We find the Board's reasoning to be flawed and unsupported by the evidence. Although we give deference to the Board's findings of fact and credibility determinations, this does not mean we "may never determine that a witness' testimony has been discredited to a degree that acceptance of that testimony is contrary to the manifest weight of the evidence." *Polk v. Board of Turstees of Police Pension Funds of the City of Park Ridge*, 253 Ill. App. 3d 525, 536 (1993); see also *Roszak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130, 142 (2007) (pension board's discrediting of applicant was against manifest weight of the evidence where it relied on evidence unrelated to the disability and not supported by the record). Such is the case here.

¶ 44        We question the Board's decision to credit J.B.'s testimony over Bulow's. Zimmerman, who heard the testimony and observed the witnesses, found Bulow significantly more credible than J.B. when comparing her clear, consistent testimony to J.B.'s inconsistencies and unreliability. The Board provides no sound reasoning for rejecting Zimmerman's credibility findings. By taking J.B.'s account at face value because seemingly only he would know if his breathing was restricted, the Board completely overlooks J.B.'s admitted bias in wanting Bulow to get fired, his inconsistencies and exaggerated testimony when compared to the security footage, his impeachment with hospital records and security footage, and the substantial weight of evidence showing Bulow did not restrict J.B.'s breathing as evidenced by J.B.'s aggressive conduct during the hold and immediately upon release.

¶ 45        The Board's assessment that "[n]othing in the record disproves that J.B. was struggling to breathe" is belied by the record and security footage. J.B. constantly struggled against Bulow, was able to eventually stand up, and cursed, yelled, and told Bulow to let him go the entire time. When Bulow released him, J.B. immediately stood up, walked away without issue, and tried to re-engage in the fight. These actions are entirely inconsistent with someone whose breathing was restricted to the point of almost blacking out, as J.B. claims.

¶ 46        The Board takes issue with Zimmerman's failure to cite any evidence that someone's breathing is not restricted if they can still talk. Instead, the Board chose to rely on Chou's testimony that "[w]e've unfortunately seen in situations nationally *** that even if that pressure is on their breathing ability, that they are still able to verbalize" and that "by holding the arm through the front, you run the risk of *** potentially restricting breathing." Even so, Chou never opined that J.B.'s breathing was restricted. Nor does Chou's testimony explain how J.B. was able to struggle against Bulow to the point of standing up, walked away without issue, and planned to

continue to fight until a student held him back. Bulow, on the other hand, explained that she used safe martial arts techniques specifically designed not to restrict J.B.'s breathing. Based on her arm placement and J.B.'s conduct, Bulow deduced that J.B.'s breathing was not restricted as he claimed.

¶ 47 To bolster its findings, the Board gave undue credence to a statement contained in the investigative report in which Zagorski purportedly said that Bulow "choked [J.B.] like a headlock," and "still had her arm around his neck for a full 5 minutes." The Board accepted this statement as completely true despite Bulow's contrary testimony and Melendez's statement in the report that describes how Bulow put J.B. in a " 'seat belt hold' holding him over his shoulder and under his armpit."

¶ 48 The Board also relied on a student witness's statement that J.B. was "breathing hard" to show J.B.'s breathing was restricted. On the contrary, this supports that J.B. could breathe and was "breathing hard" from engaging in a violent fight and struggling against Bulow. The student's statement goes on to say that Bulow told J.B. to calm down before she grabbed him, that he was "cursing [Bulow]," and was "trying to get up the whole time." We are troubled by the Board's disregard of these undisputed facts, which overwhelmingly support Bulow's version of events and undercut J.B.'s claim that he was choked and nearly lost consciousness.

¶ 49                    2. Bulow's Actions Were Not the Cause of J.B.'s Suffering

¶ 50 In finding J.B. "sustained physical pain and humiliation caused by Bulow's physical hold," the Board relied on J.B's testimony and hospital records. However, the record shows J.B. lied about going to the hospital immediately and exaggerated his injuries. There is no corroborating documentation of bruising, swelling, other marks, or medical test results on J.B. consistent with being choked for minutes on end. There are also a multitude of intervening

factors that could have contributed to J.B.'s minor injuries, including J.B. being punched in the forehead and hit about his head and body during his fight before Zagorski and Bulow intervened. Further, to the extent J.B. felt humiliated by the incident, this is his own doing. Bulow acted appropriately in retraining J.B. to stop the mayhem. That J.B. worried he would be teased, or the video could have gone viral, is a foreseeable outcome of his own misconduct, not Bulow's response.

¶ 51                              3. Bulow's Restraint Did Not Violate CPS Policy

¶ 52       Bulow also challenges the Board's findings, consistent with Chou's opinion, that her restraint "was not temporary, [she] did not use limited force, and *** violated CPS policy." We agree these findings are against the manifest weight of the evidence.

¶ 53       We begin by noting, Chou opined Bulow violated CPS policy based on protocols taught in safety-care training. However, safety-care training was never offered to Bulow. Also, the CPS policy then in effect permitted "temporary physical restriction of a student using limited force" in emergency situations exactly like this to "prevent a student from completing an act that would result in potential physical harm to himself or another or damage to property." The policy does not define "temporary," and expressly allows momentary physical intervention "to remove a disruptive student who is unwilling to voluntarily leave an area." This is precisely the situation Bulow faced.

¶ 54       Nevertheless, Chou opined that Bulow's hold was longer than "temporary." She acknowledged physical interventions could last "a brief few minutes" and be as long as "absolutely necessary." Chou and the Board both ignored the undisputed evidence that Bulow was faced with an emergency, there was no security guard present, and she used her martial arts training to prevent J.B. from causing physical harm to others or damage to property in a safe and

experienced manner. Given the testimony and videos in evidence, we are puzzled how the Board did not find Bulow restrained J.B. temporarily and no longer than necessary, especially considering how he continued to yell, swear, and make threats to kill others during the hold and admitted he was prepared to fight again afterwards.

¶ 55                    B. Bulow's Conduct Is Not Irremediable *Per Se*

¶ 56      We also agree with Bulow that the Board lacked sufficient cause to terminate her employment based on its erroneous finding that her conduct was irremediable *per se.*

¶ 57       "Cause" is defined as "that which law and public policy deem as some substantial shortcoming which renders a teacher's continued employment detrimental to discipline and effectiveness" (*Raitzik v. Board of Education of the City of Chicago*, 356 Ill. App. 3d 813, 831 (2005)) or that "which the law and sound public opinion recognize as a good reason for the teacher to no longer occupy [her] position" (*McCullough v. Illinois State Board of Education*, 204 Ill. App. 3d 1082, 1087 (1990)). "Cause" can be remediable or irremediable. 105 ILCS 5/34-85(a) (West 2020). Unless a teacher's conduct is irremediable, the Board must give a written warning of the cause, which, if not removed, may result in charges. *Id.*

¶ 58      Here, the Board found Bulow's conduct was *per se* irremediable, *i.e.*, "cruel, immoral, negligent, or criminal or that in any way causes psychological or physical harm or injury to a student." See 105 ILCS 5/34-85(a). Whether cause is irremediable is a question of fact reviewed under the manifest weight of the evidence standard. *Younge v. Board of Education of the City of Chicago*, 338 Ill. App. 3d at 522, 531 (2003).

¶ 59      We have reviewed the entire record and videos in evidence. We have considered Bulow's tenure as a teacher with an impeccable record and the restraint she shows in the videos before jumping into the fray. We have concluded that Bulow was in no way negligent or cruel in using

her trained skills to save others from significant harm J.B. incited. See Black's Law Dictionary (12th ed. 2024) (defining "cruelty" as "[t]he intentional and malicious infliction of mental or physical suffering on a living creature, especially a human"). When the brawl spilled into the gym, Bulow waited and assessed the situation for almost a full minute. In contrast, Zagorski immediately ran toward the fight and grabbed J.B. from behind. He was not punished. Bulow intervened only after J.B. broke away from Zagorski, more fighters ran into the gym, and she saw an angry, shirtless J.B. ready to attack. J.B. admitted he wanted to continue fighting when he entered the gym and Bulow prevented him from doing so. Without any formal training from CPS on how to handle such a situation, Bulow used martial arts techniques to restrain J.B. in what she believed to be the safest possible way. Considering J.B. continued to cuss, yell, and threaten others, Bulow reasonably restrained him until the risk he posed to others seemed to pass.

¶ 60     The Board maintains that Bulow should have done nothing, called for security to help, and that Bulow, rather than J.B. and the other fighters, put her team in harm's way because she failed to escort them to the locker room. However, the locker room was blocked by the fight, and Bulow had no way of contacting security. The fight continued because the staff was not trained to handle the situation and the only security guard on duty was posted five minutes away. We cannot countenance the Board's attempt to shift the blame onto Bulow for J.B.'s inappropriate behavior and characterize it as irremediable *per se*. Cf. *M.F. Booker v. Board of Education of the City of Chicago*, 2016 IL App (1st) 151151, ¶ 87 (teacher's conduct was irremediable *per se* where he hit students on the back of the head and grabbed them by their collars, hair, and neck and "none of the situations [he] faced required him to use a physical intervention with his students"); *James v. Board of Education of the City of Chicago*, 2015 IL App (1st) 141481, ¶ 18, 21 (pretending to throw stapler at a disruptive student with enough force to strike another student

in the head, causing bleeding and recurrent headaches was negligent and, therefore, irremediable *per se*). Accordingly, we find the Board's decision to discharge Bulow without written warning was clearly erroneous and we are left with a definite and firm conviction that a mistake has been committed.

¶ 61                                    III. CONCLUSION

¶ 62        For the foregoing reasons, the Board's decision is reversed. The Board is instructed to reinstate Bulow to her tenured teacher position with back pay and "all benefits, rights and privileges [she] would have retained had [she] remained on the job." *Grant v. Board of Education of the City of Chicago*, 282 Ill. App. 3d 1011, 1017 (1996).

¶ 63        Reversed and remanded with directions.